IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL CREMIN,<br><br>        Plaintiff,<br><br>  v.<br><br>McKESSON CORPORATION EMPLOYEES' LONG TERM DISABILITY BENEFIT PLAN and LIBERTY LIFE ASSURANCE COMPANY OF BOSTON,<br><br>        Defendants.<br>_____/ | No. C 04-4394 CW<br><br>ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY ADJUDICATION AND DENYING DEFENDANT'S CROSS-MOTION |

    Plaintiff Michael Cremin moves for partial summary adjudication that the Court will review Defendant Liberty Life Assurance Company's[1] termination of his long-term disability benefits under a de novo standard. Defendant opposes the motion and cross-moves for summary adjudication that the Court will review the termination under an abuse of discretion standard. The matter was heard on August 12, 2005. Having considered the parties' papers, the evidence cited therein and oral argument on the motions, the Court GRANTS Plaintiff's motion for partial summary adjudication and DENIES Defendant's cross-motion.

BACKGROUND

    The following facts are taken from the administrative record (AR). Plaintiff began working for McKesson Corporation in 1980.

---

[1] On January 5, 2005, the Court approved a stipulation substituting Defendant Liberty Life Assurance Company for Defendant McKesson Corporation Employees' Long Term Disability Benefit Plan (McKesson Plan), and dismissing the claims against McKesson Plan.

At all times relevant to this action, Plaintiff was covered by the McKesson Plan, which is a benefits plan organized under the Employee Retirement Income Security Act (ERISA).

Plaintiff suffered a heart attack in 1988. On January 23, 1998, Plaintiff was placed on short-term disability by his cardiologist Dr. Gershengorn due to an unspecified cardiac condition. Plaintiff returned to work on February 10, 1998, but worked only part-time until September 21, 1998, when he filed a claim for long-term disability benefits. On the long-term disability claim form, Plaintiff listed his disabling conditions as coronary artery disease and anxiety; the claim form identified both Dr. Gershengorn and Plaintiff's psychiatrist, Dr. Karalis. The physician's statement, which was completed by Dr. Karalis, stated that Plaintiff suffered from severe anxiety disorder and defined his physical impairment as Class 5: "severe limitation of functional capacity: incapable of minimum (sedentary) activity." At the time Plaintiff applied for long-term disability benefits, the McKesson Plan was self-funded by the McKesson Corporation and administered by Preferred Works.

As part of its investigation of Plaintiff's claim for long-term benefits, Preferred Works requested continuing documentation of his disability from his treating physicians. Dr. Karalis submitted forms on November 16, 1998, December 16, 1998, January 22, 1999, and March 17, 1999. Each form stated that Plaintiff continued to suffer from severe anxiety disorder and was totally disabled. Plaintiff was granted Social Security disability benefits in January, 1999.

Preferred Works awarded Plaintiff long-term disability benefits on April 20, 1999. The approval letter stated that Plaintiff would receive long-term benefits for twenty-four months, and would thereafter continue to receive benefits if Plaintiff (1) could prove by "objective medical evidence" that he was unable to perform any occupation for which he was reasonably qualified, and (2) was receiving Social Security disability benefits. The McKesson Plan defines "disability" as follows:

> "Disability" shall mean any physical or mental condition arising from an illness, pregnancy or injury which renders a Participant incapable of performing work. During the first thirty (30) months of Disability, a Participant must be unable to perform the work of his or her regular occupation or any reasonably related occupation, and must not, except as provided in Section 3.4, be performing work or services of any kind for remuneration. After thirty (30) months of Disability, a Participant must be unable to perform the work of any occupation for which he or she is or becomes reasonably qualified by training, education or experience, and, in addition, be receiving Social Security benefits on account of his or her disability.

Effective January 1, 2000, McKesson Corporation became wholly insured by Defendant, and Defendant became responsible for both the funding and administration of the McKesson Plan. Defendant was expressly granted sole discretionary authority to interpret the terms of the plan and to determine benefit eligibility.

On March 10, 2000, Defendant received documents from Dr. Karalis indicating that Plaintiff suffered from anxiety disorder and cardiac impairment, that Dr. Karalis was providing Plaintiff supportive psychotherapy, and that Plaintiff remained totally disabled. On May 9, 2000, Defendant received an activities questionnaire from Plaintiff which stated that Plaintiff could, among other things, drive his car, occasionally go grocery

3

shopping, and visit friends' houses.  On March 27, 2001, Defendant received additional documents from Dr. Karalis which indicated that Plaintiff's psychiatric condition had not improved.

In November, 2001, Defendant requested updated medical information from Dr. Gershengorn.  On December 4, 2001, Dr. Gershengorn submitted a physical capacities form which stated that Plaintiff was physically capable of sedentary work.  On February 4, 2002, Plaintiff filled out another activities questionnaire which was similar to the first; it stated that he could drive for short periods of time, left his house several times per week, and could not regularly exercise.  On February 13, 2002, Defendant received another physician's statement from Dr. Karalis which stated that he had last seen Plaintiff February 2, 2002, that Plaintiff remained totally disabled due to anxiety disorder, that Plaintiff's prognosis remained poor, and that he could not return to work.

On March 9, 2002, Defendant began a review of Plaintiff's claim file.  On March 14, Susan Leonardos, a registered nurse, completed an initial review and concluded the following: "There is nothing objective from psychiatrist to support lack of functional activity/there is no mention of medications, no therapy notes."  In late March, Defendant ordered surveillance of Plaintiff.  On Thursday, March 28, Friday, March 29, and Saturday, March 30, Plaintiff was twice seen leaving his house, once to go to the store and once to drive to an acquaintance's house, and was once seen retrieving an object from his car.

In May, 2002, Defendant requested updated medical information from Dr. Gershengorn.  Dr. Gershengorn submitted updated medical

4

information along with office notes which indicated that, among other things, Plaintiff had been prescribed Xanax as early as May 8, 2001. On August 6, 2002, Nurse Leonardos determined that, based upon her experience as a nurse, Plaintiff was capable of performing sedentary functional activity.

On August 12, 2002, Defendant received an updated physician's statement from Dr. Gershengorn which stated that Plaintiff continued to suffer from coronary heart disease, that he was restricted in all functional activities other than sitting, and that his estimated return to work date was "unknown." On August 13, Defendant received updated office notes from Dr. Karalis, which indicated that he had seen Plaintiff on February 5, 2002, April 11, 2002, May 22, 2002, and August 6, 2002. On each occasion, Dr. Karalis noted that he provided supportive therapy to Plaintiff.

On August 30, 2002, Defendant sent Plaintiff a letter stating that his long-term disability benefits had been terminated. The letter indicated that Defendant had determined that Plaintiff was capable of sedentary work, relying in part upon the functional limitations form completed on August 12, 2002 by Dr. Gershengorn. Defendant also stated that its determination was based in part upon Nurse Leonardos' conclusion that "there is not enough information to support lack of function from a psychiatric perspective. The claimant sees the psychiatrist sporadically and is on no psychiatric medication." The termination letter stated that Plaintiff could perform the following sedentary jobs: financial analyst, budget analyst, economist, and credit analyst.

In a letter dated October 10, 2002, Plaintiff appealed the

5

termination of his benefits. The October 10 letter also requested, among other things, copies of the surveillance tapes that Defendant had made of Plaintiff. Plaintiff also sent Defendant a letter dated October 18, 2002 from Dr. Karalis in which the psychiatrist expressed his disagreement with the termination of benefits. Specifically, Dr. Karalis stated that it appeared that Defendant had terminated Plaintiff's disability benefits based solely upon the August 12, 2002 physician's statement from Dr. Gershengorn which indicated that Plaintiff was not restricted from sitting for eight hours, although he was restricted in all other physical activities. Dr. Karalis further stated that Plaintiff could not perform the sedentary jobs recommended by Defendant because Plaintiff did "not possess the stabilization of moods and control of psychiatric symptomatology required to have predictably stable cognitive functioning to perform these jobs, which assume full cognitive functioning."

Defendant conducted further daily surveillance of Plaintiff from November 6 through November 10. Over the course of those five days, Plaintiff was observed leaving his residence only three times: once to retrieve a newspaper on the curbside, once to drive to the store, and once to drive to an unknown location. These surveillance tapes were never given to Plaintiff to review. Plaintiff did not receive copies of the tapes from the first surveillance until November 26, 2002.

Plaintiff called Defendant on November 21, 2002 and informed a representative that his cardiologist, Dr. Gershengorn, also disagreed with Defendant's decision to terminate his benefits and

6

would be submitting a letter to that effect. Also in November, Defendant initiated a review by a psychiatrist of the information in Plaintiff's file. On November 30, 2002, psychiatrist Dr. Mirkin submitted a report that, under the heading "Recommendations and Conclusions," criticized the treatment that Plaintiff had received from Dr. Karalis. There are four sub-points under this heading, which are summarized as follows: (1) Dr. Karalis should have used treatment other than psychotherapy, including medication, (2) there is no indication of imminent threat from Plaintiff's cardiac disease, so Dr. Karalis' treatment should have been more active, (3) Dr. Karalis' office notes are brief, and do not support his medical conclusion of total disability for Plaintiff, and (4) there was no indication from the record that Plaintiff was particularly susceptible to another heart attack. This report was not given to Plaintiff to review.

On December 6, 2002, Defendant denied Plaintiff's appeal. The denial letter noted Dr. Mirkin's conclusion that there was a "discrepancy between level of claimed impairment and the low intensity of care provided" by Dr. Karalis, and also stated that Dr. Karalis' opinion, expressed in his October 18, 2002 letter, that Plaintiff could not perform the sedentary jobs recommended by Defendant "appears inaccurate because it is not supported in his office notes."

On December 21, 2002, Defendant received a letter dated December 4 from Dr. Gershengorn, to which Plaintiff had referred in his November 21, 2002 phone call. That letter stated that, while Dr. Gershengorn did report the functional limitations cited in

7

Defendant's original termination decision letter, Plaintiff also had limitations on non-exertional activities such as "structured schedules, deadlines, adversarial relationships, and commuting to work." Dr. Gershengorn further stated as follows: "He remains on cardiac medications . . . and Xanax, and he remains in therapy for his anxiety disorder. I am unaware of any dramatic improvement in Mr. Cremin's medical condition that warrants reversal of the previous decision, which found him to be disabled."

On October 18, 2004, Plaintiff filed a complaint for declaratory judgment that he is entitled to long-term disability benefits under the McKesson Plan. On February 18, 2005, the Court held a telephonic case management conference, during which it explained that the matter would be decided on cross-motions for judgment under Federal Rule of Civil Procedure 52. See Kearney v. Standard Ins. Co., 175 F.3d 1084, 1094-95 (9th Cir. 1999). However, the parties were allowed to file, prior to filing Rule 52 cross-motions, motions for summary adjudication of the standard of review that the Court will apply to Defendant's termination of Plaintiff's long-term disability benefits.

## LEGAL STANDARD

ERISA provides Plaintiff with a federal cause of action to recover the benefits he claims are due under the McKesson Plan. 29 U.S.C. § 1132(a)(1)(B). The standard of review of a plan administrator's denial of ERISA benefits depends upon the terms of the benefit plan. Absent contrary language in the plan, the denial is reviewed under a de novo standard. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). However, if "the benefit plan

8

expressly gives the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the plan's terms," an abuse of discretion standard is generally applied. Id.; Taft v. Equitable Life Assurance Soc'y, 9 F.3d 1469, 1471 (9th Cir. 1993). The Ninth Circuit has also referred to this as an "arbitrary and capricious" standard. McKenzie v. Gen. Tel. Co. of Cal., 41 F.3d 1310, 1314 & n.3 (9th Cir. 1994); Taft, 9 F.3d at 1471 n.2 (use of the term "arbitrary and capricious" versus "abuse of discretion" is a "distinction without a difference").

However, even where a benefit plan expressly grants discretionary authority to the plan administrator, a district court may nevertheless apply a more stringent standard of review if the plaintiff can show that a conflict of interest exists. Hensley v. Northwest Permanente P.C. Retirement Plan & Trust, 258 F.3d 986, 995 (9th Cir. 2001). An apparent conflict arises where the plan administrator is also the insurer. Tremain v. Bell Indus., Inc., 196 F.3d 970, 976 (9th Cir. 1999). In such cases, the court must "look further into the plan administrator's dual role by applying the 'less deference' test." McDaniel v. Chevron Corp., 203 F.3d 1099, 1108 (9th Cir. 2000). The test is two pronged: (1) first, the plaintiff must provide material, probative evidence tending to show an actual conflict of interest, which (2) shifts the burden of proof to the plan administrator to show that the apparent conflict did not affect the decision to deny or terminate benefits. Id. If there is probative evidence of an actual conflict and the plan administrator cannot rebut it, the denial of benefits is reviewed de novo. Nord v. Black & Decker Disability Plan, 356 F.3d 1008,

9

1010 (9th Cir. 2004), on remand from <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822 (2003).

## DISCUSSION

The parties do not dispute that the McKesson Plan expressly grants Defendant discretionary authority as plan administrator to construe the plan's terms and determine benefit eligibility.  The parties also do not dispute that there is an apparent conflict because Defendant is both the McKesson Plan's insurer and its administrator.  Thus, the Court's inquiry must turn to whether Plaintiff has submitted material, probative evidence that Defendant had an actual conflict of interest when it terminated Plaintiff's long-term disability benefits.

Material, probative evidence of an actual conflict "may consist of inconsistencies in the plan administrator's reasons, insufficiency of those reasons, or procedural irregularities in the processing of the beneficiary's claims."  <u>Black & Decker</u>, 356 F.3d at 1010 (internal citations omitted).

Plaintiff has identified several factors that he argues constitute probative evidence of an actual conflict. First, Plaintiff notes that Defendant's December 6, 2002 denial of his appeal relied in large part upon Dr. Mirkin's report criticizing Dr. Karalis' treatment of his psychiatric disorders, and that he was not permitted to see the report prior to Defendant's final decision.  Plaintiff also notes that he was never provided with tapes from the November, 2002 surveillance, and that he was not provided with tapes from the March, 2002 surveillance until late November, 2002.  Citing <u>Booton v. Lockheed Med. Benefit Plan</u>, 110

10

1  F.3d 1461 (9th Cir. 1997), and Abram v. Cargill, Inc., 395 F.3d 882
2  (8th Cir. 2005), Plaintiff argues that a full and fair review
3  requires meaningful dialogue between plan administrators and
4  beneficiaries, and that Defendant's failure to disclose Dr.
5  Mirkin's report was not consistent with such a review.  In Abram,
6  the plan administrator denied an appeal based in large part upon a
7  physician's opinion letter that was submitted to the administrator
8  during the appeal process but that Abram did not see until after
9  the final decision was made.  395 F.3d at 885-86.  The court ruled
10 that, because Abram did not have access to the letter, she could
11 not meaningfully participate in the appeals process: "There can
12 hardly be meaningful dialogue between the claimant and the Plan
13 administrators if evidence is revealed only after a final decision.
14 A claimant is caught off guard when new information used by the
15 appeals committee emerges only with the final denial."  Id. at 886.
16     Plaintiff further argues that Defendant failed to utilize a
17 proper definition of the term "disabled."  Specifically, Plaintiff
18 notes that the plan provides for long-term disability benefits
19 after the initial twenty-four month period only if a claimant can
20 prove by objective medical evidence that he or she is unable to
21 perform any occupation for which he or she is reasonably qualified,
22 and is receiving Social Security disability benefits.  Plaintiff
23 argues that the plan administrator, in determining whether a
24 claimant is disabled, conducts the same analysis and uses the same
25 definitions as does the Social Security Administration (SSA), and
26 the expressed correlation between the disability determinations by
27 the plan administrator and the SSA requires the administrator to

11

1  award long-term benefits if the claimant is determined to be
2  disabled for purposes of collecting Social Security.  In support of
3  this argument, Plaintiff cites <u>Boyd v. Trustees of United Mine</u>
4  <u>Workers Health & Retirement Fund</u>, 873 F.2d 57, 59 (4th Cir. 1989)
5  and <u>Robertson v. Connors</u>, 848 F.2d 472, 475 (4th Cir. 1988), in
6  which the Fourth Circuit ruled that, under a plan which required
7  the receipt of Social Security benefits as a condition for
8  receiving plan benefits, the award of Social Security benefits
9  created an "irrebutable presumption of disability."
10      In addition, Plaintiff argues that the objective medical
11 evidence clearly showed that he was totally disabled, and Defendant
12 was required to obtain adequate information to provide a reasonable
13 basis to make a decision to the contrary.  See <u>Kunin v. Benefit</u>
14 <u>Trust Life Ins. Co.</u>, 910 F.2d 534, 538 (9th Cir. 1990).  Plaintiff
15 notes that he was deemed totally disabled under the McKesson Plan
16 and by the SSA in 1999, that his medical records showed no change
17 in his condition, that Defendant's surveillance showed nothing
18 inconsistent with his condition, and that his two treating
19 physicians both disagreed in writing with Defendant's determination
20 on August 30, 2002 that he was no longer totally disabled.  And,
21 Plaintiff argues that Dr. Mirkin's analysis was erroneous; Dr.
22 Mirkin's report was based in part upon his belief that Plaintiff
23 was not being treated with psychiatric drugs, when in fact
24 Plaintiff had been taking Xanax, an anti-anxiety drug, for several
25 years.  Plaintiff also argues that Defendant should have waited to
26 make its final decision until it had received Dr. Gershengorn's
27 December 4, 2002 letter, which stated that the cardiologist did not

12

agree with Defendant's decision to terminate Plaintiff's benefits. Plaintiff contends that, although Defendant did not receive the letter until after it rendered its final decision, it knew of the existence and general content of the letter from the November 21 phone call.

Plaintiff has submitted probative evidence tending to show that Defendant had an actual conflict of interest when it terminated his benefits; thus, the burden of proof shifts to Defendant to show that the apparent conflict did not affect its decision. See McDaniel, 203 F.3d at 1108. Defendant does not meet that burden.

First, Defendant argues that it was not necessary to disclose Dr. Mirkin's report because it did not contain new information and instead merely supported its initial termination of benefits. However, Defendant acknowledges in its opening brief that Dr. Mirkin's report was necessary because, during the appeal process, "Dr. Kiralis [sic] refuted Liberty's conclusions and findings." Def.'s Opp'n at 20. Based upon Defendant's acknowledgment that the findings in its initial termination letter had been refuted, Dr. Mirkin's report was new information of which Plaintiff should have been made aware. See Abram, 395 F.3d at 886.

Second, Defendant argues that Boyd and Robertson are not binding and are distinguishable, because in those cases it was not disputed that a disability finding for purposes of Social Security benefits created an irrebutable presumption of entitlement to ERISA benefits under the plan at issue. While acknowledging that "the definitions of disability [under the SSA and the McKesson Plan] are

13

similar, they are not identical," Defendant cites <u>Black & Decker</u>, 538 U.S. at 832-33, in which the Supreme Court noted "critical differences" between the Social Security disability plan and the ERISA benefits plan at issue in that case. The Court ruled that, while the SSA has a "treating physician rule" that mandates deference to the findings of the claimant's doctors, there is no such requirement in ERISA cases. <u>Black & Decker</u>, 538 U.S. at 832. Therefore, although the SSA's definition of disability is nearly identical to that of the McKesson Plan and Plaintiff's Social Security award thus constitutes evidence of his disability, it does not create an irrebutable presumption of disability under the plan.

 Regarding Plaintiff's contention that he submitted sufficient objective medical evidence of his disability, Defendant argues that he did not, and cites the findings (1) in its initial termination letter that Plaintiff was not under continuous and regular care of a physician, and (2) in its final decision that Dr. Mirkin concluded that Dr. Karalis' treatment of Plaintiff was not consistent with total disability. In its initial termination letter, Defendant relied primarily upon Nurse Leonardos' conclusion that Plaintiff "sees the psychiatrist sporadically and is on no psychiatric medication" and Dr. Gershengorn's August 12, 2002 report indicating that Plaintiff did not have any physical restrictions on sitting. However, the treatment notes that Defendant had from Dr. Karalis, which it received on August 13, 2002, indicated that Plaintiff had seen Dr. Karalis four times in the previous six months in order to receive supportive therapy for his anxiety. And, the record indicated that Plaintiff was taking

14

1 the anti-anxiety drug Xanax.  As discussed above, Defendant has
2 acknowledged that the findings in its initial termination letter
3 have been refuted.
4    With respect to its final decision denying Plaintiff's appeal,
5 Defendant's argument that Dr. Mirkin found fault with Dr. Karalis'
6 conclusions is not persuasive because, as noted above, Plaintiff
7 never had the opportunity to view and address Dr. Mirkin's report,
8 which contained little more than an incomplete critique of Dr.
9 Karalis' treatment plan.  In addition, although Defendant did not
10 receive the letter dated December 4, 2002 from Dr. Gershengorn
11 until after it rendered its final decision, and therefore could not
12 consider it, it was at least on notice from Plaintiff's phone call
13 that it could no longer rely upon Dr. Gershengorn's August 12, 2002
14 report to justify a denial of benefits.  Indeed, Dr. Gershengorn's
15 December 4 letter stated his belief that Plaintiff remained
16 completely disabled.
17    For the foregoing reasons, Defendant has failed to rebut
18 Plaintiff's material, probative evidence that an actual conflict
19 existed when Defendant, as the McKesson Plan's insurer and
20 administrator, terminated Plaintiff's long-term disability
21 benefits.  Thus, the Court will review the termination under a de
22 novo standard.

                              CONCLUSION

24    Accordingly, the Court GRANTS Plaintiff's motion for partial
25 summary adjudication (Docket No. 22) and DENIES Defendant's cross-
26 motion (Docket No. 26).  The Court will review the parties' Rule 52
27 motions under the de novo standard.

15

This matter will be decided on Rule 52 cross-motions for judgment.  See Kearney, 175 F.3d at 1095.  Plaintiff shall file his opening brief no later than October 21, 2005.  Defendant shall file its opposition and cross-motion, in a single brief, no later than November 4, 2005.  Plaintiff shall file a reply and opposition to the cross-motion, also in a single brief, no later than November 11, 2005, and Defendant shall file its reply no later than November 18, 2005.  The matter will be heard on December 2, 2005, at 10:00 a.m.

IT IS SO ORDERED.

Dated:     10/3/05

_____
CLAUDIA WILKEN
United States District Judge

16