IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL CREMIN,<br><br>      Plaintiff,<br><br>  v.<br><br>McKESSON CORPORATION EMPLOYEES' LONG TERM DISABILITY BENEFIT PLAN and LIBERTY LIFE ASSURANCE COMPANY OF BOSTON,<br><br>      Defendants.<br>_____/ | No. C 04-4394 CW<br><br>ORDER DENYING PLAINTIFF'S MOTION FOR JUDGMENT, DENYING DEFENDANT'S CROSS-MOTION, AND REMANDING CASE TO PLAN ADMINISTRATOR |

Plaintiff Michael Cremin moves the Court, pursuant to Federal Rule of Civil Procedure 52, for review of Defendant Liberty Life Assurance Company's[1] termination of his long-term disability benefits. Defendant opposes the motion, and cross-moves for judgment in its favor. The matter was heard on December 2, 2005. Having considered the parties' papers, the evidence cited therein and oral argument on the motions, the Court DENIES the parties' motions for judgment, but GRANTS Defendant's motion in the alternative to remand the case to the Plan Administrator for further consideration.

BACKGROUND

The following facts are taken from the administrative record, McGee Decl., Ex. C, unless otherwise noted. Plaintiff began

---

[1] On January 5, 2005, the Court approved a stipulation substituting Defendant Liberty Life Assurance Company for Defendant McKesson Corporation Employees' Long Term Disability Benefit Plan (McKesson Plan), and dismissing the claims against McKesson Plan.

1 working for McKesson Corporation in 1980. At all times relevant to
2 this action, Plaintiff was covered by the McKesson Plan, which is a
3 benefits plan organized under the Employee Retirement Income
4 Security Act (ERISA).

5 Plaintiff suffered a heart attack in 1988. Ten years later,
6 on January 23, 1998, Plaintiff was placed on short-term disability
7 by his cardiologist, Dr. Gershengorn, due to an unspecified cardiac
8 condition. Dr. Gershengorn initially recommended that Plaintiff
9 take a two week break, return to work part-time for two or three
10 weeks, and then be reassessed. CF-0490.

11 Plaintiff returned to work on February 10, 1998, but worked
12 only part-time until September 21, 1998, when he filed a claim for
13 long-term disability benefits. On the long-term disability claim
14 form, Plaintiff listed his disabling conditions as coronary artery
15 disease and anxiety; the claim form identified both Dr. Gershengorn
16 and Plaintiff's psychiatrist, Dr. Karalis.[2] According to the
17 physician's statement completed by Dr. Karalis, Plaintiff suffered
18 from severe anxiety disorder. Dr. Karalis defined his physical
19 impairment as Class 5: "severe limitation of functional capacity:
20 incapable of minimum (sedentary) activity." At the time Plaintiff
21 applied for long-term disability benefits, the McKesson Plan was
22 self-funded by the McKesson Corporation and administered by
23 Preferred Works.

---

25 [2]Research conducted by Defendant shows that the Medical Board
of California put Dr. Karalis on probation, which was completed on
26 June 9, 1998. He also resigned, with charges pending, from the
State Bar of Californa, after serving five years' probation for
27 Medicaid fraud.

28

2

Preferred Works awarded Plaintiff long-term disability benefits on April 20, 1999. The approval letter stated that Plaintiff would receive long-term benefits for twenty-four months, and would thereafter continue to receive benefits if Plaintiff (1) could prove by "objective medical evidence" that he was unable to perform any occupation for which he was reasonably qualified, and (2) was receiving Social Security disability benefits. On August 16, 1999, the Social Security Administration granted Plaintiff disability benefits, effective retroactively from January, 1999.

The McKesson Plan defines "disability" as follows:

> "Disability" shall mean any physical or mental condition arising from an illness, pregnancy or injury which renders a Participant incapable of performing work. During the first thirty (30) months of Disability, a Participant must be unable to perform the work of his or her regular occupation or any reasonably related occupation, and must not, except as provided in Section 3.4, be performing work or services of any kind for remuneration. After thirty (30) months of Disability, a Participant must be unable to perform the work of any occupation for which he or she is or becomes reasonably qualified by training, education or experience, and, in addition, be receiving Social Security benefits on account of his or her disability.

Effective January 1, 2000, McKesson Corporation became wholly insured by Defendant, and Defendant became responsible for both the funding and administration of the McKesson Plan.

Dr. Gershengorn's office notes and tests results date back to January, 1997. In early 1997, Dr. Gershengorn noted that Plaintiff was "feeling pretty well," with back and hip pain but no chest pain. On June 27, 1997, Dr. Gershengorn noted that Plaintiff "uses Xanax for sleep." CF-484.

On December 4, 2001, Dr. Gershengorn submitted to Defendant a

3

physical capacities form which stated that Plaintiff was physically capable of sitting up to eight hours, with breaks. CF-269. He also checked a box indicating that Plaintiff could "work 8 hours per workday." Id. In May, 2002, in response to a request from Defendant for updated medical information, Dr. Gershengorn submitted office notes which indicated that, among other things, Plaintiff was still taking Xanax as recently as May 8, 2001. According to an August 12, 2002, update from Dr. Gershengorn, Plaintiff suffered from coronary heart disease, he was permanently restricted in all functional activities other than sitting, and his estimated return to work date was "unknown." CF-169.

According to forms regularly submitted by Dr. Karalis between September, 1998 and May, 2000, Plaintiff suffered from anxiety disorder and was "totally disabled." Dr. Karalis' initial notes of September 10, 1998, near the end of Plaintiff's part-time work experience, indicate that Plaintiff said that he had psychologically deteriorated over the year, that he couldn't "work those long hours at McKesson," and that he felt he was "pushing himself into another heart attack." CF-499. The documentation indicates that Dr. Karalis provided Plaintiff with supportive psychotherapy, on an as-needed basis, but that Plaintiff took cardiac medications only. CF-0301, 0303. According to a March 20, 2001 form, Dr. Karalis indicated that Plaintiff's psychiatric condition had "not worsened" during his treatment, but that Plaintiff could do "no work at all." CF-0281. At that point, Dr. Karalis described Plaintiff's Axis V Global Assessment of

4

1  Functioning (GAF) as 45.[3]  Dr. Karalis revised Plaintiff's
2  estimated date to return to work to "never."  CF-0279.  On February
3  13, 2002, Dr. Karalis told Defendant that he had last seen
4  Plaintiff on February 2, 2002; that Plaintiff remained totally
5  disabled due to anxiety disorder; that Plaintiff's prognosis
6  remained poor; and that Plaintiff could not return to work.  Dr.
7  Karalis' office notes further indicate that he had contact with
8  Plaintiff on February 5, 2002, April 11, 2002, May 22, 2002, and
9  August 6, 2002.  On each occasion, Dr. Karalis noted that he
10 provided supportive therapy to Plaintiff.  In his February 5, 2002
11 note, Dr. Karalis stated "GAF remains 45."[4]

12   In a May 5, 2000 questionnaire, Plaintiff stated that he
13 could, among other activities, drive his car, occasionally go
14 grocery shopping, and visit friends' houses.  He stated that he was
15 not able to participate in an exercise program such as aerobics,
16 that he had difficulty sleeping at night, and that he sometimes
17 took a nap during the day for one to four hours.  On February 4,
18 2002, Plaintiff filled out a similar, updated activities
19 questionnaire.  At that point, he stated he could drive for short

---

[3] Plaintiff asks the Court to take judicial notice of an excerpt from the American Psychiatric Association's <u>Diagnostic and Statistical Manual of Mental Disorder</u>, Fourth Edition DSM-IV-TR, which describes the GAF scale between 41 and 50 as "Serious symptoms (e.g., suicial ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  The Court grants the unopposed request for judicial notice.

[4] Defendant attempts to dismiss the recent GAF rating as "inadmissible hearsay, unsupported, speculative, and improper expert opinion."  Defendant fails to show that Dr. Karalis' opinion as Plaintiff's treating psychiatrist is inadmissible.

5

periods of time, and left his house several times per week. However, he reported that he could not participate in an exercise program, was able to sit only one hour per day, and that his daily routine involved fourteen hours in bed or watching television, in addition to a two hour nap. According to Defendant's notes from a February 7, 2002 phone call, Plaintiff reported that he had "hurt his ankle and torn some ligaments due to exercise he needs to do." CF-0015.

Defendant began a review of Plaintiff's claim file on March 9, 2002. Susan Leonardos, a registered nurse, conducted the initial review. According to her notes, Dr. Karalis told her on August 7, 2002 that he had not seen Plaintiff since February, 2002 (contrary to his records of visits in April and May), that he was "not saying that [Plaintiff] cannot RTW [return to work]," and that he agreed that Plaintiff "may well have a sedentary capacity." CF-0175. When Nurse Leonardos asked why Plaintiff was not prescribed anti-depressant or anti-anxiety medication, Dr. Karalis reportedly told her that he did not do so because of Plaintiff's cardiac condition, but that Plaintiff had "improved overall," that he was seen "only" "every few" months, and that he had "never been in therapy." CF-180. After Nurse Leonardos concluded that there was no objective evidence from Dr. Karalis to support a finding that Plaintiff was incapable of sedentary functional activity, Defendant ordered surveillance of Plaintiff. On Thursday, March 28, Friday, March 29, and Saturday, March 30, Plaintiff was twice seen leaving his house, once to go to the store and once to drive to an acquaintance's house, and was once seen retrieving an object from

6

his car.

On August 30, 2002, Defendant sent Plaintiff a letter stating that his long-term disability benefits had been terminated. The letter indicated that Defendant had determined that Plaintiff was capable of sedentary work, relying in part upon the functional limitations form completed on August 12, 2002 by Dr. Gershengorn. Defendant also stated that its determination was based in part upon Nurse Leonardos' opinion that "there is not enough information to support lack of function from a psychiatric perspective. The claimant sees the psychiatrist sporadically and is on no psychiatric medication." The termination letter stated that Plaintiff could perform the following sedentary jobs: financial analyst, budget analyst, economist, and credit analyst.

In a letter dated October 10, 2002, Plaintiff appealed the termination of his benefits. The October 10 letter also requested, among other things, copies of the surveillance tapes that Defendant had made of Plaintiff. Plaintiff also sent Defendant a October 18, 2002 letter from Dr. Karalis in which the psychiatrist expressed his disagreement with the termination of benefits. Specifically, Dr. Karalis stated that it appeared that Defendant had terminated Plaintiff's disability benefits based solely upon the August 12, 2002 physician's statement from Dr. Gershengorn which indicated that Plaintiff was not restricted from sitting for eight hours, although he was restricted in all other physical activities. Dr. Karalis reported the October 15, 2002 administration of Zung

7

Depression and Anxiety Psychological Tests[5]; the results showed, in part, that Plaintiff felt more nervous and anxious than usual, that he felt weak or tired easily, that he got tired for no reason, that he had some loss of mental clarity, and that he did not find it easy to make decisions.  Dr. Karalis opined that, given the exertional restrictions imposed by Dr. Gershengorn, Plaintiff could not work; he elaborated,

> In my experience, patients who attempt job reentry in jobs allowing only "sitting" do not do well, since sitting becomes uncomfortable and there is often (as with you) an ongoing psychological impairment (concentrating, remembering, analyzing, etc.--commonly called cognitive functions).

CF-0141.  Dr. Karalis further stated that Plaintiff could not perform the sedentary jobs recommended by Defendant because Plaintiff did "not possess the stabilization of moods and control of psychiatric symptomatology required to have predictably stable cognitive functioning to perform these jobs, which assume full cognitive functioning."  CF-0143.

Defendant conducted further daily surveillance of Plaintiff from November 6 through November 10, 2002.  Over the course of those five days, Plaintiff was observed leaving his residence only three times: once to retrieve a newspaper on the curbside, once to drive to the store, and once to drive to an unknown location.  At one point, Plaintiff left his car parked partially in a lane of

---

[5] Dr. Mirkin, hired by Defendant to review Plaintiff's file, states that the Zung test is a self-rating scale that can be used to assess progress over time, but which "is not a diagnostic tool and certainly not one that should be used to resolve a dispute as to the valid presence of symptoms because there is no objective validity scale built into the inventory questions."  CF-0114.  Plaintiff does not dispute this statement.

8

traffic.

Plaintiff called Defendant on November 21, 2002 and informed a representative that his cardiologist, Dr. Gershengorn, also disagreed with Defendant's decision to terminate his benefits and would be submitting a letter to that effect. Also in November, Defendant initiated a review by psychiatrist Dr. Mirkin of the information in Plaintiff's file. On November 30, 2002, Dr. Mirkin submitted a report that, under the heading "Recommendations and Conclusions," criticized Dr. Karalis' treatment and opinions, on the grounds that: (1) the psychatric information supporting Plaintiff's disability was subjective only, and his condition should have been treated more aggressively, e.g. with medication, if it was as debilitating as Dr. Karalis claimed; (2) there was no indication of imminent threat from Plaintiff's cardiac disease, and if Plaintiff displayed abnormally cautious behavior, Dr. Karalis should have treated it more aggressively; (3) Dr. Karalis' office notes are very brief, and fail to support his medical conclusion of total disability for Plaintiff and his specific opinion that Plaintiff lacked the cognitive functioning to work; and (4) there was no indication from the record why Plaintiff suddenly became so concerned about another heart attack.

In a December 4, 2002 letter to Defendant, Dr. Gershengorn stated that, while he did report the functional limitations cited in Defendant's original termination decision letter, Plaintiff also had limitations on non-exertional activities such as "structured schedules, deadlines, adversarial relationships, and commuting to work." CF-85. Dr. Gershengorn further stated as follows: "He

9

remains on cardiac medications . . . and Xanax, and he remains in therapy for his anxiety disorder. I am unaware of any dramatic improvement in Mr. Cremin's medical condition that warrants reversal of the previous decision, which found him to be disabled." Id.

On October 18, 2004, Plaintiff filed a complaint for declaratory judgment that he is entitled to long-term disability benefits under the McKesson Plan.

In its October 3, 2005 order addressing the issue of the standard of review, the Court found that Plaintiff had submitted material, probative evidence that Defendant had an actual conflict of interest when it terminated Plaintiff's benefits. Among other factors, the Court found that Dr. Mirkin's report was "little more than an incomplete critique of Dr. Karalis' treatment plan," which Plaintiff did not have the opportunity to view and address. Oct. 3, 2005 Order at 15.

## LEGAL STANDARD

ERISA provides Plaintiff with a federal cause of action to recover the benefits he claims are due under the Plan. 29 U.S.C. § 1132(a)(1)(B). The standard of review of a plan administrator's denial of ERISA benefits depends upon the terms of the benefit plan. In its October 3, 2005 order, the Court determined that Defendant's termination of Plaintiff's benefits would be reviewed de novo. Therefore, as explained by the Court at the February 18, 2005 case management conference, the Court conducts a bench trial based on the administrative record in order to evaluate Plaintiff's claim. Kearney v. Standard Ins. Co., 175 F.3d 1084, 1094-95 (9th

10

1 Cir. 1999) (en banc), cert. denied, 528 U.S. 964 (1999).

2     In its de novo review of Defendant's decision to deny
3 benefits, the Court must decide whether Plaintiff is disabled under
4 the terms of the plan.  In Juliano v. Health Maintenance
5 Organization of New Jersey, Inc., 221 F.3d 279, 287-8 (2nd Cir.
6 2000), the Second Circuit held that it was the plaintiffs' burden
7 "to establish that they were entitled to [the] benefit [sought]
8 pursuant to the terms of the Contract or applicable federal law."
9 Following Juliano, the Court concludes that Plaintiff must carry
10 the burden to prove that he was disabled under the meaning of the
11 plan.  Sabatino v. Liberty Life Assur. Co., 286 F. Supp. 2d 1222,
12 1232 (N.D. Cal. 2003).  On de novo review, the Court may weigh
13 contradictory evidence.  Newcomb v. Standard Ins. Co., 187 F.3d
14 1004, 1007 (9th Cir. 1999).

15     "While under an abuse of discretion standard [the Court's]
16 review is limited to the record before the plan administrator, this
17 limitation does not apply to de novo review."  Jebian v. Hewlett-
18 Packard Co. Employee Benefits Organization Income Protection Plan,
19 349 F.3d 1098, 1110 (9th Cir. 2003).  The Court has discretion "to
20 allow evidence that was not before the plan administrator 'only
21 when circumstances clearly establish that additional evidence is
22 necessary to conduct an adequate de novo review.'"  Kearney, 175
23 F.3d at 1090 (citations omitted); see also Mongeluzo v. Baxter
24 Travenol Long Term Disability Benefit Plan, 46 F.3d 938, 943 (9th
25 Cir. 1995) (On de novo review, "new evidence may be considered . .
26 . to enable the full exercise of informed and independent
27 judgment.").

28

11

DISCUSSION

I. Plaintiff's Evidence of Disability

As evidence that he is disabled, Plaintiff points to the following: (1) the opinions of his treating physicians, including Dr. Karalis' determination that Plaintiff had a GAF score of 45; (2) the Social Security Administration's determination that he was disabled; and (3) the results of Defendant's surveillance of Plaintiff.[6] Defendant does not dispute that Plaintiff may have been disabled at some point in the past, but argues that this evidence is insufficient to prove that his disability continued until September 1, 2002, when Defendant discontinued benefits.

A. Dr. Gershengorn

Dr. Gershengorn's records show that Plaintiff is physically capable for sitting for eight hours, but is not capable of any other regular work activity. None of the evidence from the cardiologists' records suggests that sedentary work would, in itself, put Plaintiff at cardiac risk. However, Dr. Gershengorn's December 4, 2002 letter does state that Plaintiff "also has non-exertional limitations due to his medical conditions." Dr. Gershengorn opined that non-exertional activities "that could be harmful to him include structured schedules, deadlines, adversarial

---

[6] Plaintiff also points to Defendant's failure to conduct an independent psychiatric examination of him, alleged gaps and errors in Dr. Mirkin's review of Plaintiff's file, and Defendant's failure to solicit review of Dr. Mirkin's report from Drs. Karalis or Gershengorn. Although these factors were relevant to the Court's decision to apply a de novo standard of review, and may go to the weight of Dr. Mirkin's evidence, these alleged errors are not, in themselves, affirmative evidence that Plaintiff is disabled.

12

relationships, and commuting to work."[7]  He also notes that "major depression/anxiety has been shown to be the strongest predictor of adverse outcome (MI, CABG, angioplasty) on patients with coronary artery disease," although he renders no opinion on whether Plaintiff in fact suffers from major depression or anxiety.

In the absence of any specific findings, direct observations or diagnoses to the contrary, it appears that Dr. Gershengorn's opinion regarding Plaintiff's non-exertional limitations is not based directly on objective evidence.  He may have been relying on Dr. Karalis' diagnosis, or Plaintiff's self-reporting of anxiety.  Notably, Dr. Gershengorn does not actually say that Plaintiff cannot work; instead, the cardiologist merely states that he is "unaware of any dramatic improvement in Mr. Cremin's medical condition that warrants reversal of the previous decision, which found him to be disabled."  Moreover, Plaintiff concedes that his cardiac condition, standing alone, is not disabling.  Pl.'s Reply Br. 3.  Therefore, even taking into consideration the December 4 letter, Dr. Gershengorn's records and opinions do not provide sufficient, objective medical evidence to establish that Plaintiff

---

[7] Defendant objects to the Court's consideration of Dr. Gershengorn's letter, which was not before the plan administrator when Plaintiff's benefits were terminated.  However, the Court finds that consideration of this opinion of Plaintiff's treating physician is necessary in order to "enable the full exercise of informed and independent judgment." Mongeluzo, 46 F.3d at 943.  The Court notes that Defendant was aware at the time it denied Plaintiff's appeal that Dr. Gershengorn disagreed with Defendant's denial of benefits.  Furthermore, as the Court noted in its October 3, 2005 order, Plaintiff did not have the opportunity to view and address Dr. Mirkin's report prior to Defendant's final decision regarding his benefits; under these circumstances, Defendant's objection to the letter are inconsistent and unfounded.

13

is disabled under the plan.

B.  Dr. Karalis

The parties sharply dispute the significance of Dr. Karalis' evidence.  Nurse Leonardos' notes of her August, 2002 phone conversation, in which Dr. Karalis allegedly told her that Plaintiff had improved and might have functional capability, contrast sharply with his previous, regular descriptions of Plaintiff as totally disabled, as well as his October 18, 2002 letter opining that Plaintiff's cognitive impairments prevented him from performing even a completely sedentary job.  Defendant uses this discrepancy to dismiss Dr. Karalis' February, 2002 GAF rating, an objective test, as "irrelevant" because Dr. Karalis later told Defendant that Plaintiff's condition had improved.  The Court cannot resolve the discrepancies between Nurse Leonardos' notes and Dr. Karalis' later statements.

Nevertheless, Dr. Karalis' documentation contains little in the way of objective assessment of Plaintiff's cognitive impairments.  The GAF result of 45 does provide some objective evidence of Plaintiff's level of functioning, yet the rating, in itself, shows that Plaintiff may not be able to work but not that Plaintiff cannot work, because such an assessment may relate to social rather than occupational functioning.  Plaintiff does not dispute Dr. Mirkin's opinion that the Zung tests, based on self-reporting of anxiety and depression, are not an acceptable means to reach an objective disability determination.  Dr. Karalis did not prescribe any medication for Plaintiff.  Although apparently Plaintiff was taking Xanax prescribed by Dr. Gershengorn, there is

14

no evidence in the record that Dr. Karalis was aware of this. Dr. Karalis' notes and letter state that he gave Plaintiff "supportive therapy," but nowhere does he describe the intensity, goals or outcomes of that therapy in any detail.[8] Dr. Karalis' credibility is undermined by his suspension from the California State Bar for Medicaid fraud. For these reasons, although Dr. Karalis' opinion and GAF assessment provide some evidence in support of Plaintiff's disability claim, the Court finds that Dr. Karalis' opinions are not sufficiently persuasive to allow Plaintiff to meet his burden of proof.

C. Surveillance Tapes

Plaintiff asserts that the surveillance tapes, which show a generally low level of activity as well as poor driving skills, support his claim of disability. The Court finds that the tapes, while consistent with the claimed disability, are not, in themselves, probative, objective medical evidence of disability.

D. Social Security Determination

The Social Security Administration's (SSA's) determination that Plaintiff was disabled is a factor that weighs in Plaintiff's favor. However, there are no substantive findings by the SSA contained within the administrative record. And, although SSA regulations generally require administrative law judges to give deference to the opinions of a claimant's treating physician, such special deference is not required in the ERISA context. Black &

---

[8] Plaintiff's statement that Dr. Karalis initially provided Plaintiff with "intensive" therapy is unsupported by the record. At best, the evidence shows that the two spoke or met somewhat more frequently earlier in their relationship.

15

Decker Disability Plan v. Nord, 538 U.S. 822, 829-30 (2003).  Here, much of Plaintiff's case rests on the credibility of his treating physicians.  Nevertheless, the Court finds that the SSA's determination, at minimum, provides objective support for the opinions of Plaintiff's treating physicians as of SSA's August, 1999 award of benefits.  See Calvert v. Firestar Finance, Inc., 409 F.3d 286, 294 (6th Cir. 2005) (holding that SSA disability determination supports conclusion that objective support existed for treating physician's opinion).

Plaintiff further urges the Court to find that, having required him to apply for Social Security benefits, Defendant is now judicially estopped from arguing that he is not disabled under the plan.  Judicial estoppel is a doctrine which "precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position." Rissetto v. Plumbers & Steam Fitters Local 343, 94 F.3d 597, 600 (9th Cir. 1996).  However, Defendant did not argue to the SSA that Plaintiff was disabled, and Plaintiff has not shown that Defendant has taken inconsistent positions.  Furthermore, as the Court ruled in its previous order in response to a similar argument by Plaintiff, the SSA disability determination does not create an irrebuttable presumption of disability under the plan because the SSA's mandatory treating physician rule does not apply in the ERISA context.  October 3, 2005 Order at 14 (citing Black & Decker).

## II.   Defendant's Evidence of No Disability

Although Plaintiff's evidence of continued disability is weak, Defendant does not persuasively rebut it.  The purported

16

inconsistencies identified by Defendant are overblown, or decrease the weight of Plaintiff's evidence rather than demonstrate that Plaintiff was not disabled as of September, 2002.  For instance, without additional information about the exercise that Plaintiff told Defendant he needed to do but that resulted in a broken ankle, there is no reason to think that it is necessarily inconsistent with Plaintiff's earlier May 5, 2000 statement that he could not participate in an exercise program such as aerobics.  Nor is Plaintiff's part-time employment status in 1998 persuasive evidence that Plaintiff is not disabled.  Nothing in the record reflects Plaintiff's actual work performance during that time, and Plaintiff subsequently ceased work altogether, with the support of his doctors.

    Dr. Mirkin's report is more thoroughly reasoned and supported than the opinions of Dr. Karalis.  As the Court found in its prior order, however, Dr. Mirkin's report is at best an incomplete critique of Dr. Karalis' opinions and treatment.  Dr. Mirkin did not examine Plaintiff or communicate directly with Plaintiff's treating physicians; instead, he reviewed the scanty records.  Dr. Mirkin's opinion that Plaintiff should have been treated more aggressively is persuasive, but it is equally susceptible to two different interpretations:  that Dr. Karalis erred in concluding that Plaintiff could not work, because his depression and anxiety is not that severe; or in the alternative, that Plaintiff does suffer severe depression and anxiety, but that Dr. Karalis' treatment was inadequate.

17

III.  Remedy

In light of the gaps in the record, the Court finds it cannot reach an adequately supported final adjudication of Plaintiff's disability claim.  Plaintiff has introduced some evidence of disability, but it is not sufficient to meet his burden of proof.  Nevertheless, the Court has serious questions regarding Plaintiff's level of impairment that render final judgment in Defendant's favor inappropriate.  Relatively minimal additional development of the record could significantly assist a fact-finder.  For instance, if Dr. Karalis knew that Plaintiff took Xanax prescribed by Dr. Gershengorn and relied on this in devising Plaintiff's psychiatric treatment, this would alter the import of Dr. Mirkin's opinion.  Therefore, the Court concludes that the most appropriate course is to remand Plaintiff's claim to the Plan Administrator for additional investigation.

Plaintiff argues that Defendant's authority supporting remand is inapposite.  Both <u>Gallo v. Amoco Corp.</u>, 102 F.3d 918 (7th Cir. 1996) and <u>Miller v. United Welfare Fund</u>, 72 F.3d 1066 (2nd Cir. 1995) involved a lower court's review under an "arbitrary and capricious," standard, and thus are not directly applicable to this <u>de novo</u> review.  Yet even Plaintiff's authority, also involving review under the arbitrary and capricious standard, suggests that the Court has the authority to remand a case where, as here, the facts are unclear.  Cf. <u>Grosz-Salomon v. Paul Revere Life Ins. Co.</u>, 237 F.3d 1154, 1163 (9th Cir. 2001) (holding retroactive reinstatement of benefits to be appropriate remedy where Plan Administrator's decision "was simply contrary to the facts").

18

Therefore, the Court grants Defendant's motion for remand.

## CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiff's motion for judgment (Docket No. 60) and GRANTS Defendant's cross-motion, in the alternative, to remand Plaintiff's claim to the Plan Administrator for further investigation (Docket No. 62). The case will be closed, and the Clerk shall enter judgment in Defendant's favor. Each party shall bear its own costs of the action.

IT IS SO ORDERED.

Dated: 12/21/05

*/s/ Claudia Wilken*

CLAUDIA WILKEN
United States District Judge